**Daniel MONTEIRO, Plaintiff,**

v.

**UNITED TECHNOLOGIES CORP. PRATT & WHITNEY DIVISION, Defendant.**

**No. 3:97CV899 JBA.**

United States District Court, D. Connecticut.

June 6, 2000.

Barbara L. Cohn, Cohn & Cohn, Waterbury, CT, for Daniel Monteiro, plaintiffs.

Sarah Moore Fass, Day, Berry & Howard, Stamford, CT, Albert Zakarian, Victoria Woodin Chavey, Elizabeth Ann Alquist, Daniel Adam Schwartz, Day, Berry & Howard, Hartford, CT, for United Technologies Corp, Pratt & Whitney Division, defendants.

## RULING ON MOTION FOR SUMMARY JUDGMENT [DOC. # 51]

ARTERTON, District Judge.

Plaintiff Daniel Monteiro (Monteiro) claims that the defendant United Technologies Corporation Pratt & Whitney Division (Pratt & Whitney) failed to promote him from his current position as a Labor Grade 2 welder to a Labor Grade 1 position because of his age, national origin and race in violation of federal and state law. In addition, Mr. Monteiro claims that Pratt & Whitney retaliated against him following his filing of a complaint with the CHRO in November 1995. Finally, Mr. Monteiro alleges that through such conduct, Pratt & Whitney intentionally and negligently inflicted emotional distress on him. By this motion, defendant moves for summary judgment on all counts.

For the reasons that follow, defendant's motion for summary judgment [Doc. # 51] is DENIED in part and GRANTED in part.

## I. FACTUAL BACKGROUND

Mr. Monteiro was born June 27, 1952 and has been employed by Pratt & Whitney as a welder since September 9, 1974. *See* Def. Ex. B.. On December 14, 1992, Mr. Monteiro was promoted to Labor Grade 2 and continues to work at Labor Grade 2 welder in Department 45642 at the East Hartford facility of Pratt & Whitney. Welders at Pratt & Whitney are either classified as Labor Grades 1, 2 or 3. In addition, welders work one of three

shifts (1st, 2nd or 3rd [1]). Labor Grade 1 is divided between those classified as "working leaders" or "specialists." The "working leader" working in conjunction with the "cell leader" [2] "would assign work during the shift, ensure the priorities were working, would help employees who were having specific problems on a job, would work with cell leaders on special requirements for follow-up, may work with engineering on unusual jobs ...." *See* Kane Dep. at 44. A specialist "would typically perform work that he is usually good at, that he has a higher skill level in a particular expertise." *See* Lynn Dep. at 50. At times if the working leader or lead person is not at work, the "specialist" might take on some of the lead person's responsibilities. *See* Kane Dep. at 46.

Whenever there is an opening for a Labor Grade promotion on a shift, Pratt & Whitney has the "cell leader" conduct a "survey." "A survey is where you would ask people that are in position to get promoted whether or not they're interested in the position." *See* Lynn Dep. at 45. It is not disputed that those already at the Labor Grade of the promotion have the right to transfer to the shift with the opening. The cell leader would have each worker "sign-off" that they were either interested or not interested in being considered for the promotion. *See* Lynn Dep. at 62. Under the union contract, promotions were made based on three factors: seniority, fitness, and ability. *See* Lynn Dep. at 63.

**First Opening for Labor Grade 1 (Lead Position) on Second Shift**

On February 3, 6 & 7, 1995, Pratt & Whitney surveyed welders for a Labor Grade 1 lead position opening on the 2nd shift. *See* Pl.'s Ex. 1. Mr. Monteiro was never considered for the vacant Labor Grade 1 position on the 2nd shift. Mr. Kane, the cell leader, and Mr. Lynn, the Business Unit Manager, determined he was not qualified for the lead position even though they subsequently determined he was qualified for the position of specialist. *See* Kane Dep. 96–97, 100–102, 110–12, 113–15. After surveying eleven welders of various ages and races, Pratt & Whitney offered the position to Paul Morneau.

**Opening for Labor Grade 1 Position (Lead Position or Specialist) on Third Shift**

In March 1995, Pratt & Whitney determined that there would be a Labor Grade 1 position opening on the third shift which was not yet in operation. At the time, Mr. Monteiro was a Labor Grade 2 welder on the 2nd shift. Although Pratt & Whitney claims the Labor Grade 1 position on the third shift was only a specialist position, Mr. Monteiro claims Pratt & Whitney never specified whether the position was as a lead position or as specialist and there had never been a specialist on the third shift. *See* Ricci Aff. ¶ 8 ("During the brief period of time in the spring of 1995 when the third shift was opened, the two working leaders were Donald Moore and Matt Dean. There was no differentiation between them as far as their duties or their authority."). *See* Moore Aff. ("I, Donald Moore, went on 3rd shift as a working Labor Grade I lead position on around the latter part of April 1995, in the Combustion Chamber Repair Unit (Dept.45642) at the East Hartford O & R Facility. At this time, I was joined by a second working Labor Grade I lead position on 3rd shift; Matt Dean, who wanted that position. Our jobs were equal and we both held the same authority as working lead position since no supervision was present on that shift.") Pratt & Whitney surveyed at least twelve employees including Mr. Monteiro with respect to the open Labor Grade 1 position on the third shift. *See* Pl.'s Ex. 12. Mr. Lynn and Mr. Kane were involved

---

**1.** The Third Shift does not always run, but is added when necessary to meet production needs.

**2.** The "cell leader" would be more concerned with production and the entire unit schedule including interfacing with outside suppliers. *See* Kane Dep. at 44.

in the decisionmaking process regarding the fitness of the welders under consideration. *See* Pl.'s Loc. R. 9(c) Statement at ¶ 18. On March 7, 1995, Mr. Lynn offered Mr. Monteiro the Labor Grade 1 position on the 3rd shift. *See* Monteiro Dep. at 11. On the same date, Mr. Monteiro accepted and signed an Employee Memorandum indicating he had accepted the promotion to Labor Grade 1 on the Third Shift. *See* Pl.'s Ex. 2. The Employee Memorandum Mr. Monteiro signed does not indicate whether the Labor Grade 1 position was as lead position or as a specialist. *Id.*

Although Mr. Monteiro was scheduled to transfer to the third shift and assume his Labor Grade 1 position, another employee, Matt Dean, requested to be transferred to the Labor Grade 1 position on the third shift. *See* Kane Dep. at 65–67. Since Dean was already a Labor Grade 1 on the 2nd Shift, he was entitled to the transfer and should have been surveyed before Mr. Monteiro was offered the position. Plaintiff does not dispute that Mr. Dean was entitled to the Labor Grade position on the third shift, but contends he should have received the Labor Grade 1 position that was vacated when Dean moved to the 3rd shift.

Although plaintiff claims Mr. Dean's move from the 1st shift to the 3rd shift and Donald Moore's move from the 2nd shift to the 3rd shift, created two Labor Grade 1 openings on both the 1st and 2nd Shifts, he presents no evidence controverting Pratt & Whitney's contention that only one Labor Grade 1 opening resulted and that opening was only on the 2nd shift which had already been filled by Morneau in February 1995. *See* Lynn Dep. at 69 (testifying that there was no need to replace Dean on the 1st shift since there were already two working leaders on the 1st shift and the only opening was on the 2nd shift resulting from Donald Moore's transfer).

**Second Opening for Labor Grade 1 (Lead Position) on Second Shift**

In November 1995, another working leader position became available on the 2nd shift. At the time this new working Leader position became available, Monteiro was reassigned outside the department to light duty due to a shoulder injury. Even though plaintiff was released to return with acceptable restrictions on November 6, 1995 and without restrictions on December 11, 1995, he was not returned to Department 45642 until January 1996. After surveying nine other Labor Grade 2 welders on December 18, 1995, Kane offered the promotion to Ronald Bianchi who was promoted effective February 1996. Mr. Monteiro was never surveyed for this second position even though he had been medically released by the time of the survey. Mr. Kane testified that he was not surveyed because he was out of the department and there had been no change in his and Mr. Lynn's earlier assessment that he was not qualified based on his poor communication and interpersonal skills.

On November 30, 1995, Mr. Monteiro filed a discrimination complaint with the CHRO and the EEOC alleging that he was discriminated against due to his race, national origin and physical disability in not receiving the February 1995 promotion that went to Paul Morneau. In April 1996, Mr. Monteiro filed a second complaint with the CHRO and EEOC concerning the promotion given to Ron Bianchi in December 1995.

## II. STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted when "there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law." As a "general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Tomka v. Seiler,* 66 F.3d 1295, 1304 (2d Cir.1995). If, when viewing the

evidence produced in the light most favorable to the non-movant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *See Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991).

In cases alleging employment discrimination, the Second Circuit has held that additional considerations must be taken into account when deciding whether summary judgment should be granted. *See Gallo v. Prudential Residential Services*, 22 F.3d 1219, 1224 (2d Cir.1994). In such cases, the trial court must be particularly cautious about granting summary judgment when the employer's intent is at issue, and affidavits and depositions must be scrutinized for circumstantial evidence that, if believed, would support the plaintiff's claim. *Id.* at 1224. Though caution must be exercised in granting summary judgment where intent is genuinely in issue, summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact. *See e.g., Woroski v. Nashua Corp.*, 31 F.3d 105, 110 (2d Cir.1994).

## III. DISCUSSION

### A. Discrimination based on age, race and national origin (Count One)

The familiar burden shifting analysis from *McDonnell Douglas* applies to plaintiff's discrimination claims under the ADEA and Title VII. Under that test, Mr. Monteiro must first establish a prima facie case of discrimination by demonstrating membership in a protected class, satisfactory performance of his duties, an adverse employment action, and circumstances giving rise to discrimination. *See Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995). If he succeeds in this task, the burden then shifts to Pratt & Whitney to produce a legitimate, nondiscriminatory reason for his termination. If Pratt & Whitney is able to do so, the burden shifts back to Mr. Monteiro to show that the company's stated reason is in fact a pretext for discrimination based on an impermissible factor such as age, race or national origin. *Id.*

The Court will consider plaintiff's evidence of discrimination based on age and national origin/race separately.

### 1. Age Discrimination

It is undisputed that Mr. Monteiro was 41 and 42 at the times he claims he was not promoted, therefore he was a member of the protected class under the ADEA. *See* 29 U.S.C. § 631(a). Although Pratt & Whitney claims Mr. Monteiro is not qualified for the lead position, Mr. Monteiro presents evidence, that if credited by the factfinder could support a finding that he was competent, at least at a base level to perform the duties of lead position. *See* Moore Aff. ¶ 4 "I found Danny [Monteiro] to be a very conscientious, skilled productive worker who would have made a good leadman."; George Aff. ¶ 10 "In my opinion Mr. Monteiro is and was as capable of being a welding leadman based upon his skills and ability to get a job done and, at the time of the promotion of Mr. Bianchi, Dan was probably more capable than Mr. Bianchi."

To show the adverse employment action on which his discrimination claims are based, Mr. Monteiro relies on three different occasions he claims to have been denied a promotion and/or demoted from a Labor Grade 1 position in 1995. First, Mr. Monteiro presents evidence that he was qualified for, but never surveyed for the February 1995 promotion to Labor Grade 1 on the 2nd shift that went to Mr. Morneau, age 36. Next, he claims he was demoted after receiving the promotion to Labor Grade 1 on the 3rd shift when Dean expressed his interest in the position. However, Mr. Monteiro does not rebut that this action was required by contract. Nor is his conclusory claim that another opening was thus created by Mr. Dean's transfer supported by any evidence in the record. Finally, he claims he was never considered for the additional Labor Grade

I position, 2nd shift, that was surveyed in December 1995 after he was released to return to his department from light duty. Since an adverse employment action will be found where a plaintiff applies for a specific promotion and is rejected for a discriminatory reason, *see Brown v. Coach Stores,* 163 F.3d 706, 710 (2d Cir.1998), the Court must determine whether he has identified circumstances giving rise to an inference that he was denied promotion to Labor Grade 1 based on his age.

As previously noted the evidence of circumstances related to Mr. Monteiro's loss of the Labor Grade 1 position he accepted on the 3rd shift does not give rise to an inference that he was denied this promotion based on his age, absent any proffer of evidence rebutting Pratt & Whitney's evidence that Mr. Dean was entitled to transfer to the 3rd shift under the terms of the Collective Bargaining Agreement, since he already was a Labor Grade 1 on the 1st shift. Accordingly, Mr. Monteiro fails to show a triable claim that Pratt & Whitney's failure to implement Mr. Monteiro's promotion to Labor Grade 1 on the 3rd shift in March 1995 was based on or motivated by his age.

' With respect to the failure to promote Mr. Monteiro to the Labor Grade 1 openings which became available in February 1995 and December 1995, Mr. Monteiro claims the inference of age discrimination can be drawn from the facts that 1) he was over 40 years old at the time of each promotion, 2) Mr. Morneau (d/o/b 10/28/1958) and Mr. Bianchi (d/o/b 6/24/1956), the two individuals who received these promotions, were 36 and 38 years old at the time they were promoted, 3) these two individuals had less seniority but Mr. Monteiro was more skilled, and 4) Dennis Kane, a decisionmaker made a comment implying a preference for younger employees at some prior, but unspecified time. *See* Pl.'s Mem. in Opp'n at 18.

Defendant contends that even though Mr. Morneau and Mr. Bianchi were both under 40 years of age, this fact is not significant in considering the employer's alleged treatment of employees of differing ages in light of *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 312–13, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). Defendant overstates the holding of *O'Connor,* which simply established that an inference of discrimination could be shown by evidence of replacement with a "significantly younger" worker even if that younger worker was also within the protected class of workers over 40. *See Tarshis v. Riese Organization,* 211 F.3d 30, 38 (2d Cir.2000) ("A difference of eight years between the age of the person discharged and his replacement, as in the instant case, is not insignificant."). Thus, the Court concludes that because the promoted employees were outside the protected class, the fact of their seven and four years age *differentials compared to plaintiff* means that their promotion over Mr. Monteiro is not insignificant as a matter of law, and under the circumstances of this case could support an inference of age discrimination.

While Mr. Monteiro's claim that Mr. Morneau and Mr. Bianchi had "significantly" less seniority may be overstated given that they were hired only three years after Mr. Monteiro, they were junior to him and there is substantial factual dispute as to the relative competencies of Mr. Monteiro, Mr. Morneau and Mr. Bianchi for the lead position. *See* George Aff. ¶ 10; Johnson Aff. ¶ 3 and 7; Ricci Aff. ¶ 7; Phinney Aff. ¶ 9 and Moore Aff. ¶ 5.

Plaintiff also relies, for an inference of age discriminatory intent, on the alleged comment made by Mr. Kane, ("One time I was on the shop floor doing a job and he made his usual rounds, and I'm not specifically sure of the date, but I do remember the conversation, and we were talking about pushing work out, and he says, "Well, I need a lot more younger energetic people in here to push work," and that was said to me.") (Monteiro Dep. at 90), Pratt & Whitney challenges the adequacy of this evidence to defeat summary judgment as

unspecified in time and unrelated to the employment actions at issue. However, since Mr. Kane's presence in the department commenced in December 1994–January 1995, see Kane Dep. at 29, 30, this comment must have occurred at some time after December 1994. See Moore Arbitration Test. Pl.'s Ex. 10. Defendant argues that even if made during the relevant period, such comment only constitutes "some evidence" of age bias and in light of the other undisputed facts would not support a rational finding of age discrimination as the Second Circuit found in *Woroski v. Nashua Corp.*, 31 F.3d 105, 109 (2d Cir. 1994). In *Woroski* the Second Circuit, acknowledging the question to be a close one, affirmed the district court's granting of summary judgment in an age discrimination claim, even though there was some evidence of age bias by one of the decisionmakers responsible for staff reductions in light of the other evidence showing age bias played no role in the downsizing decisions. In contrast, the comment in this case was made by a key decision maker whose characterization of the relative qualifications of Mr. Monteiro and non-protected workers is challenged as the motivation for the promotion decisions, and thus could add support to the inference that age was a substantial or motivating factor that made a difference in the promotion decisions.

While Pratt & Whitney claims that its offer of these promotions first to older workers, who refused them, sufficiently offsets any inference of age discrimination, plaintiff's evidence suggests that these workers were offered these promotions because they were known not to be interested in any transfer to this less desirable third shift. While Pratt & Whitney rebuts by noting that Matt Dean voluntarily switched from the 1st shift to the 3rd shift, the weighing of the respective inferences from these disputed issues of fact should not be resolved on summary judgment.

In summary, given Mr. Monteiro's evidence that two non-protected younger workers got the sought after promotions, that he was more qualified and that Kane, a decisionmaker, made the youth preference comment, the Court concludes that Mr. Monteiro has come forward with sufficient evidence from which a factfinder could reasonably infer that Pratt & Whitney's claimed reason for its actions was masking unlawful discrimination.

Accordingly, while this is admittedly close, Defendant's Motion for Summary Judgment on Plaintiff's discrimination claim based on age, Count One, is DENIED.

### 2. Title VII Discrimination based on Race and/or National Origin

■ In opposing this motion for summary judgment, Mr. Monteiro claims that Pratt & Whitney discriminated against him because cell leader Kane believed he was Puerto Rican as evidenced by the fact that at least two of his co-workers heard Mr. Kane, refer to Mr. Monteiro as a "big Puerto Rican," and his race on an employee list was listed as "B" meaning black. See Pl.'s Ex. # 23. Howard Ricci, one of plaintiff's co-workers, submitted an affidavit stating that "[d]uring an informal survey by Dennis Kane I was asked if I was interested in a leadman position which would be available on second shift in early 1995, I questioned why the offer was being made to me and not to Danny Monteiro since he was more senior than me. I was told by Mr. Kane that Danny was a big Puerto Rican who intimidated people and could not get along with them so he would not be considered." See Ricci Aff. ¶ 12 (Pl.'s Ex. 4.) Donald Moore, a former leadman on the 2nd shift submitted an affidavit stating that "[i]n February, 1995, while working on the floor, Dennis Kane, the Business Unit Manager for our Department noticed that I was having trouble lifting a part and told me to have my big Puerto Rican friend help me with the part. In March that same year, I was told by Mr. Kane and Cell leader, Randy Lynn, that they were not going to offer the

Grade 1 Second shift position to my Big Puerto Rican Buddy because he did not get along with people." *See* Moore Aff. ¶ 6.

Pratt & Whitney claims that even if credited, Mr. Kane's reference to Mr. Monteiro as a "big Puerto Rican" does not reflect discriminatory animus, but was merely descriptive, albeit erroneous since Mr. Monteiro is Portuguese not Puerto Rican. While the jury might agree with Pratt & Whitney' suggestion that such reference was purely descriptive and not evidence any discriminatory animus, the Court is unable to resolve the nuances of this obvious ethnic reference as a matter of law. *See Gallagher v. Delaney*, 139 F.3d 338, 342 (2d Cir.1998) ("Whatever the early life of a federal judge, she or he usually lives in a narrow segment of the enormously broad American socio-economic spectrum, generally lacking the current real-life experience required in interpreting subtle sexual dynamics of the workplace based on nuances, subtle perceptions, and implicit communications.").

Pratt & Whitney claims in its Reply Memorandum that Ricci and Moore's statements cannot be credited because they have changed their allegations from those originally made in the CHRO investigation and/or have their own motivations to fabricate the truth, *see* Aug. 19 Letter to CHRO, Def.'s Ex. K. The Court rejects Pratt & Whitney's invitation to find that Mr. Moore's and Mr. Ricci's statements are so lacking in credibility that *no reasonable* factfinder could rely on them because these are issues of credibility inappropriate to resolution on summary judgment.

Pratt & Whitney's proffered reason for not considering Mr. Monteiro for lead positions, that he lacked communication skills,

lacked the ability to work with others and lacked better qualifications than Mr. Morneau and Mr. Bianchi—has been sufficiently rebutted by Mr. Monteiro's evidence of Kane's remarks and the evidence show factually disputes on qualifications such that the Court concludes there exist disputed material issues of fact which await determination by the factfinder.

Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's discrimination claim based on race/national origin in violation of Title VII and corresponding state law in Count One is DENIED.

## B. Retaliation Claim (Count Three)[3]

In Count Three, plaintiff claims that after he filed his CHRO complaint related to the denial of the first working leader position on November 30, 1995, Pratt & Whitney retaliated against him by denying him the second working leader position, raises beyond his union mandated raises and the opportunity to obtain assignments outside of his department.[4]

In order to establish a prima facie case of retaliation, plaintiff must demonstrate that: (1) he was engaged in a protected activity; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer. *See Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir.1993). Once a prima facie case has been established, the burden of production shifts to the employer to articulate a legitimate, nonretaliatory reason for the adverse employment action.

---

3. The Court previously dismissed Count Two which alleged discrimination based on disability in violation of the Americans with Disability Act.

4. Although plaintiff filed a grievance form with Pratt & Whitney dated March 22, 1995 claiming he had been demoted from Labor Grade I to Labor Grade II, he cannot base his

retaliation claim on this activity presumably since he made no claim of discrimination based on race or age in his grievance and there is no evidence of any nexus between the grievance and any of the retaliatory actions he claims were taken against him. *See* Def.'s Reply Mem. at Ex. B.

*See Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 443 (2d Cir.1999). If the employer meets its burden, the burden then shifts back to plaintiff to "demonstrate that there is sufficient potential proof for a reasonable jury to find [that] the proffered legitimate reason [was] merely a pretext for impermissible retaliation," *id.,* and that "defendant's real motivation was the impermissibly retaliatory motive." *Donato v. Plainview–Old Bethpage Cent. Sch. Dist.,* 96 F.3d 623, 634 (2d Cir.1996).

██ While Pratt & Whitney concedes that plaintiff's filing of a complaint with the CHRO constitutes protected activity, it maintains that Mr. Monteiro suffered no adverse employment action subsequent to filing his CHRO complaint and that Mr. Monteiro fails to demonstrate any causal connection between the claimed treatment and the protected activity. While it is undisputed that the second promotion occurred on December 18, 1995, while Mr. Monteiro was outside the department, and that Mr. Monteiro filed his CHRO complaint on November 30, 1995, this record is devoid of any evidence that Mr. Kane, the decision maker, knew of Mr. Monteiro's CHRO complaint at the time he made his December 18, 1995 offer to Mr. Bianchi or that he knew as of December 18, 1995 that Mr. Monteiro had been released by his doctor to return to work. *See* Def.'s Reply Mem. Ex. A.

Mr. Monteiro further claims as evidence of Pratt & Whitney's retaliation the fact that he did not receive any merit raises following his filing of his CHRO complaint. *See* Monteiro Dep. at ¶ 22 ("Since 1995 I have not received any raises other than those required by contract until a few months ago, shortly after I discussed the lack of raises in my deposition. I had previously received merit raises from time to time.") Mr. Monteiro does not dispute that he received all raises he is entitled to under the union contract and points only to merit raises to which he believes he was entitled. He contends that if one elimi-

nates all Labor Grade 2 welders who are at the grade pay maximum and presumably thus ineligible for merit raises, five of the remaining six welders have received larger aggregate raises ranging from $4.36 to $6.33 compared to Mr. Monteiro who has only received $4.23 in merit raises. Mr. Monteiro concedes as he must that the other welder, Donald Horton, received smaller merit raises than he, but contends this is explained by the fact that Horton is considered a less productive worker.

Although plaintiff's evidence shows five employees received larger raises than he received during this period, it does not show that he was thus treated less favorably than all employees who did not file discrimination claims since at least one welder received less than he did. Nor does Mr. Monteiro show when Mr. Kane or his successor, Lydia O'Neil learned of his CHRO complaint in relation to these merit increase decisions. While it can be reasonably inferred that at some point after Pratt & Whitney received the CHRO complaint on December 11, 1995, these Business Unit Managers became aware of Mr. Monteiro's claim, the minimal statistic differentials offered by plaintiff do not constitute adequate evidence here on which a reasonable factfinder could properly infer retaliatory motivation.

Accordingly, Defendant's Motion for summary judgment as to plaintiff's claim of retaliation, Count Three, is GRANTED.

## C. Intentional Infliction of Emotional Distress (Count Five)

 Pratt & Whitney contends that Mr. Monteiro fails to demonstrate a claim for intentional infliction of emotional distress since this claim "requires conduct exceeding all bounds of decent society and which is calculated to cause, and does cause mental distress of a very serious kind." To prevail on a claim for intentional infliction of emotional distress, the plaintiff must prove: (1) that the actor intended to inflict emotional distress, or knew or should have known that emotional distress

was the likely result of its conduct, (2) that the conduct was extreme and outrageous, (3) that the defendant's conduct was the cause of the plaintiff's distress, and (4) that the emotional distress sustained by the plaintiff was severe. *See Petyan v. Ellis,* 200 Conn. 243, 253, 510 A.2d 1337 (1986). Ordinarily, the disputed conduct must exceed all bounds tolerated by decent society, and cannot be merely rude, tactless or insulting. *See Petyan,* 200 Conn. at 254, 510 A.2d 1337 (1986). "[A] line can be drawn between the slight hurts which are the price of a complex society and the severe mental disturbances inflicted by intentional actions wholly lacking in social utility." *Whelan v. Whelan,* 41 Conn. Supp. 519, 522, 588 A.2d 251 (1991).

In opposing summary judgment on this claim, Mr. Monteiro relies on what he claims is evidence of unusual improprieties in filling a leader position on the 2nd shift in December 1995 immediately following his CHRO filing and while he was out of the department although released for duty in the department, his evidence that he was twice overlooked for promotions awarded to inferior employees, and his claim that he must endure the daily humiliation of going to work knowing that his record is now considered flawed and his fellow workers consider him inferior. *See* Pl.'s Mem. in Opp'n at 27–28. Notwithstanding claimed unfairness, improprieties and shortcomings in the manner and procedures utilized by Pratt & Whitney, none of this misconduct could reasonably be found by factfinder to reach the requisite level of conduct exceeding all bounds of decent society calculated to cause serious injury.

Accordingly, Defendant's Motion for Summary Judgment as to plaintiff's claim for intentional infliction of emotional distress, Count Five, is GRANTED.

### D. Negligent Infliction of Emotional Distress (Count Four)

Defendant contends that plaintiff's claim for negligent infliction of emotional dis-

tress should be dismissed since in *Parsons v. United Technologies Corp.,* 243 Conn. 66, 88–89, 700 A.2d 655 (1997), the Connecticut Supreme Court limited such claims to conduct in the termination process itself. While recognizing the split of authority on this issue, the Court does not read *Parsons* as foreclosing this cause of action in all non-termination circumstances, particularly in light of the Second Circuit's recent observation that the Connecticut Supreme Court might permit a claim for negligent infliction of emotional distress in the absence of a termination, in light of the 1993 amendments to the Workers' Compensation Act that excluded coverage for mental and emotional impairment. *See Malik v. Carrier Corp.,* 202 F.3d 97, 103 n. 1 (2d Cir.2000) ("[W]e note that the Connecticut Supreme Court has arguably acknowledged the possibility that such a claim might arise in the employment context .... Whether a viable emotional distress claim for negligent acts in the employment context exists under Connecticut law is thus unclear.").

At oral argument, Pratt & Whitney requested that the Court consider alternate arguments which had not been raised in its motion for summary judgment. While the Court will not entertain such arguments not raised nor briefed by the parties at this stage, such grounds may be raised at trial pursuant to Fed.R.Civ.P. 50.

Accordingly, Defendant's motion for summary judgment as directed to Count Four alleging negligent infliction of emotional distress is DENIED.

### Conclusion

For the reasons set forth above, Defendant's motion for summary judgment [Doc. # 51] is DENIED as to Count One alleging discrimination based on age, race and/or national origin under federal and state law and as to Count Four alleging negligent infliction of emotional distress and GRANTED as to Counts Three alleging retaliation, and as to Count Five alleg-

ing intentional infliction of emotional distress.

IT IS SO ORDERED.